**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Patricia Urton,

    Plaintiff,

        v.                                          Case No. 1:07cv387

Board of Education of the Lockland
City School District,                            Judge Michael R. Barrett

    Defendant.

## **OPINION & ORDER**

This matter is before the Court upon Defendant Board of Education of the Lockland City School District's Motion for Summary Judgment. (Doc. 36) Plaintiff Patricia Urton has filed a Memorandum in Opposition (Doc. 42) and Defendant has filed a Reply (Doc. 51).

## **I. BACKGROUND**

In 1991, Patricia Urton began working for the Board of Education of the Lockland City School District ("the Board") in the Treasurer's office. (Doc. 34, Patricia Urton Depo. at 18) Urton worked as an Accounts Payable/Payroll Coordinator. (Id., Ex. 5) In August of 2004, Michael Lau became Treasurer. (Doc. 32, Michael Lau Depo. at 28)[1] Donna Hubbard was the Superintendent at that time. (Doc. 31, Donna Hubbard Depo. at 9)

Urton claims that Lau would have regular outbursts of anger, which were usually directed at her. (Urton Depo. at 44, 47, 70) For example, Lau became angry and yelled at Urton when a series of checks was missing. (Id. at 71, 75) Lau accused Urton of failing to mail the checks. (Id. at 71) On another occasion, Lau yelled at Urton because he was

---

[1]There is some discrepancy in the record whether this date was August of 2003 or August of 2004.

angry about school district employees spending money without submitting a purchase order. (Id. at 67-68, 75) Lau yelled at Urton again when she did not have information about certain contracts, even though that information was not available to her. (Id. at 68-69) Urton claims that Lau's behavior made it difficult to complete her work because "it is hard to stay focused on what you are doing when someone is breathing down your neck." (Id. at 191)

Urton also claims that on one occasion, Lau made a statement which made her think that Lau thought men were superior to women. (Id. at 59-60) Urton does not recall the exact statement, and did not know if Lau was joking. (Id.) On another occasion, Lau yelled at Urton in front of two male accountants in his office because there were funds missing from an account. (Id. at 86-88) Lau then turned to the two men and said, "see what I have to deal with?" (Id. at 88-89)

In May of 2005, Urton met with Board members Greg Propes and Steve Cox. (Doc. 33, Gregory Propes Depo. at 18-21) Urton informed Propes and Cox that Lau was treating her rudely, and Lau was often loud and unprofessional. (Id.) Urton explained to Propes and Cox that Lau's behavior had created a hostile work environment. (Id. at 18) The Board called an "Emergency Board Meeting," where the Board questioned Hubbard and Lau. (Id. at 27-34) During the meeting, Lau apologized for his actions and explained that his behavior was the result of his frustration with Urton in getting work done. (Id. at 30-31) Lau explained that Urton's work station was constantly disorganized and she continued to write manual checks despite his repeated directives to stop this practice. (Hubbard Depo. at 40) Hubbard was told by the Board if Urton did not do what Lau directed her to do, Urton was to be written up under the procedure that the school district used for

reprimanding employees. (Id. at 29)[2]

Urton did not receive a response from the Board after the Board Meeting. (Urton Depo. at 136) Urton contacted Propes, who told Urton to discuss the matter with Hubbard. (Id. at 140) In an email dated May 11, 2205, Hubbard refused to meet alone with Urton, citing legal concerns. (Hubbard Depo., Ex. 11)

In July of 2005, Urton found an ad for a penis extender which Lau had printed to their shared printer. (Urton Depo. at 160-61) The ad had printed in the middle of her payroll reports. (Id. at 160) Urton was embarrassed and threw the ad away. (Id. at 161) Urton mentioned the ad to Hubbard a few days later, but Hubbard laughed and did not take any action. (Id. at 162-64)

That same month, Hubbard forwarded an email to Urton which posted a opening in the Mariemont School District working as an assistant to the treasurer. (Hubbard Depo., Ex. 11) Hubbard wrote: "Please don't take this as meaning I would prefer that you leave but just as a friend I thought you would want to see this." (Id.)

In August of 2005, Rita Broun, the assistant superintendent, asked Urton to complete a form related to her complaint of harassment and date it back to the May 2005 Board meeting. (Urton Depo. at 138-39) Urton met with Hubbard, Broun, and Lau to discuss her complaint. (Id. at 92-93) Urton was informed that Hubbard was to act as a

---

[2]In her deposition, Hubbard testified:

Q: So then, essentially, the result of her complaint back in May was: We've got to document her failures, right?

A: Yes.

(Hubbard Depo. at 35)

mediator between Lau and Urton, but that Lau was "the one you have to report to, and you guys are just going to have to work it out." (Id. at 93) After this meeting, Lau's behavior improved, but he still acted aggressively and blamed Urton for missing payroll information on one occasion. (Id. at 154-56) Around the same time period, the Board hired Larry Loos to work on a part-time basis in the treasurer's office. (Id. at 109-110)

On September 13, 2005, Urton met with Hubbard and legal counsel for the Board. (Hubbard Aff. ¶ 2) Hubbard presented Urton with a letter asking Urton if she wanted the school district to conduct a formal investigation into her complaint of harassment. (Urton Depo, Ex. 9) On the same day, Urton received a letter of reprimand for continuing to keep a disorganized work station and writing manual checks. (Id., Ex. 10) This is the first written reprimand Urton received during her employment with the Board. (Doc. 42-2, Patricia Urton Aff. ¶ 2)

On September 16, 2005, Urton asked the Board to conduct a formal investigation into her complaint of hostile work environment. (Urton Depo., Ex. 3) Broun was designated as the hearing officer for the investigation. (Hubbard Depo., Ex. 4) On September 22, 2005, Urton followed up with a letter to Broun in which Urton explained that she "believe[d] Mr. Lau has issues with women, not to say that I don't think he has conflict with men as well." (Propes Depo., Ex. 4)

On September 23, 2005, the Board suspended Urton for one day for job deficiencies. (Urton Depo., Ex. 13) The Hamilton County Educational Service Center ("HCESC") had notified the Board that Urton had failed to submit timely and complete payroll information. (Id.) This information was necessary for HCESC to assist the Board in processing its employee payroll. The Board maintains that these tasks were a part of

Urton's job responsibilities. (Urton Depo., Ex. 5)

On October 20, 2005, the Board completed its investigation into Urton's complaint of harassment. (Hubbard Depo., Ex. 4) Broun issued a written decision which explained: "As heard in testimony, Ms. Urton has stated she is not pursuing a claim for sexual harassment against Mr. Lau. Furthermore, Ms. Urton has not identified any behavior by Mr. Lau that would fall under the scope of the Board's policy on sexual harassment." (Id.) Broun concluded that Lau did not violate the Board's policy on sexual harassment or create a hostile work environment. (Id.)

On October 25, 2005, the Board suspended Urton for five days. (Urton Depo., Ex. 14) The suspension was based on three incidents. On October 7, 2005, the State Employees Retirement System ("SERS") had notified the Board that the enrollment forms for thirty-nine of its employees had not been submitted within the mandated time limits. (Hubbard Aff., Ex. A) The Board maintains that Urton was responsible for enrolling these employees. (Urton Depo., Ex. 5) On October 17, 2005, Lau had informed the Board that $187,094 in bills remain due and payable. (Urton Depo., Ex. 14, 21) The Board maintains that Urton was responsible for processing and paying outstanding bills. (Id., Ex. 5) Finally, Urton had called Lau a "moron." (Id., Ex. 14)

On November 4, 2005, Hubbard provided Urton with written notice of her intent to recommend the termination of her employment contract. (Urton Depo., Ex. 15) Hubbard's recommendation was based upon notice from the Ohio Department of Taxation that the Board had failed to pay certain quarterly taxes from 2004. (Doc. 29, Donna Hubbard Aff., Ex. B) The Board was assessed interest and penalties totaling over a thousand dollars. (Id.) Urton was responsible for filing the Board's quarterly tax reports and paying the taxes.

(Urton Depo. at 167-68)

On November 8, 2005, Urton requested, and was granted medical leave. (Urton Depo. at 11) While Urton was on leave, the Board held a pre-termination hearing. Urton attended the hearing and presented evidence of Lau's poor job performance. The Board voted against terminating Urton's contract. (Propes Depo., Ex. 5) Instead, the Board voted to demote Urton to the position of Student Intervention Assistant. (Id., Ex. 6) Urton received written notice of the decision, which included a notice of her right to appeal the decision to the court of common pleas pursuant to state law. (Urton Depo., Ex. 19)

In the Spring of 2006, Hubbard was notified by the Hamilton Clermont Cooperative Association of Boards of Education ("HCCA") that Urton had twice entered the HCCA database and increased her maximum accumulated vacation leave balance. (Hubbard Aff. ¶ 10) On May 4, 2006, Hubbard notified Urton of her intent to recommend that her contract be terminated for increasing her balance by forty days without authorization. (Hubbard Depo. 88, 96-97) On May 31, 2006, the Board conducted a pre-termination hearing where evidence was presented that Hubbard and Lau were not aware that Urton had made these changes, and had not approved the changes. (Hubbard Depo., Ex. 6; Hubbard Aff., Ex. F) The Board voted to terminate Urton for dishonesty, immoral conduct, and other acts of misfeasance, malfeasance, or nonfeasance pursuant to Ohio Revised Code § 3319.081(C). (Hubbard Aff., Exs. F, G) On June 1, 2006, Urton was sent written notice of the Board's decision, as well as her right to appeal that decision. (Urton Depo., Ex. 30) Urton was replaced by Donna Wilson, a female. (Urton Depo. at 253) In September of 2007, Lau resigned from his position of treasurer after his resignation was requested by a Board member. (Lau Depo. at 11, 15-16)

In her Complaint, Urton brings claims of sexual harassment, gender discrimination, and retaliation pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and Ohio discrimination law, Ohio Rev. Code § 4112 *et seq.* The Board seeks summary judgment on all of Urton's claims. In response to the Board's Motion for Summary Judgment, Urton withdrew her claim of discrimination based upon disparate treatment.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

### B. Applicable law

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Therefore, the Court will analyze Urton's claims under federal and state law together.

### C. Retaliation

Title VII prohibits retaliatory actions against employees who oppose, report or participate in investigations involving conduct that allegedly violates Title VII. *See* 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff can either present direct evidence of retaliation or use the *McDonnell Douglas* framework to infer retaliation from circumstantial evidence. Urton argues that she has presented both direct and circumstantial evidence of retaliation.

#### 1. Direct evidence

As direct evidence that she was terminated for complaining of harassment, Urton argues that Lau admitted that after Urton complained, the Board and Hubbard agreed that "she needed to be out of that office." (Lau Depo. at 60-63) When determining whether proffered evidence constitutes direct evidence of discrimination, courts consider whether

the evidence, if believed, compels the conclusion that retaliatory animus played a part in the challenged decision. *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 383 (6th Cir. 2002), *citing Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). The Court finds that the statement by Lau does not constitute direct evidence of retaliation. It is not clear from Lau's testimony whether the Board and Hubbard believed Urton should be removed from the treasurer's office based on her performance or her complaint.[3] Therefore, Lau's testimony does not compel the conclusion that retaliatory animus played a part in the decision to discipline and terminate Urton.

## 2. Circumstantial evidence

Absent direct evidence of retaliation, a plaintiff may establish a *prima facie* case of retaliation by establishing four elements: (1) the plaintiff engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took a materially adverse action against the plaintiff or subjected the plaintiff to severe and pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action. *Michael v. Caterpillar Fin.*

---

[3]Lau testified:

> Q: But in your opinion, Ms. Urton had things that she needed to work on that they just weren't going to get any better and we had to get her out of that office, right?
>
> A: At that point, based on the environment.
>
> Q: Based on her complaint and such, right?
>
> A: Yeah.

(Lau Depo. at 60)

*Servs. Corp.*, 496 F.3d 584, 595-596 (6th Cir. 2007).

The Board argues that Urton cannot show there was a causal connection between her complaints of harassment and her termination.

To demonstrate a causal connection between termination and the exercise of protected rights, "a plaintiff must proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Michael*, 496 F.3d at 596, *quoting Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). Urton argues that the timing of the events leading up to her termination allow an inference of retaliation.

The Sixth Circuit has recently clarified the role of temporal proximity in establishing causal connection in retaliation cases:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008), *citing Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001) ("[T]emporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection.). Here, Urton first complained to the Board about Lau's behavior in May of 2005. In September, Urton was disciplined with a letter of reprimand. However, Urton was not terminated until a year later in May of 2006. While Urton's first discipline was only four months after her first complaint, Urton cannot rely on temporal proximity alone because her termination did not occur until a year after

she complained.

The Sixth Circuit has explained that "[b]eyond temporal proximity, other indicia of retaliatory conduct would include evidence that the plaintiff was treated differently, either less positively or more negatively, than similarly situated employees who had not exercised Title VII rights, or evidence that the plaintiff was subjected to closer disciplinary scrutiny after exercising Title VII rights." *Evans v. Prospect Airport Services, Inc.*, 2008 WL 2604312, *6 (6th Cir. June 27, 2008) (unpublished), *citing Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *Little*, 265 F.3d at 364-65. Here, it appears that Urton was subjected to closer disciplinary scrutiny after she complained to the Board. Urton did not have a history of discipline before she made her complaint. However, after she complained about Lau's behavior, Urton was given a negative performance review and was subjected to a series of progressive discipline, which ultimately ended in her termination. Based on this evidence, Urton has satisfied her burden of showing a causal connection. *Accord Mickey*, 516 F.3d at 523 ("[T]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met.").

After the plaintiff sets out his or her *prima facie* case, the burden of production shifts to the employer to offer a non-discriminatory reason for the adverse employment action. *Ladd v. Grand Trunk Western R.R., Inc.*, 2009 WL 77908, *5 (6th Cir. Jan. 14, 2009) (slip op.), *citing Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). If the employer meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was mere pretext. *Id.* However, the burden of persuasion remains with the plaintiff throughout, even while the burden of production shifts between the parties. *Id.*

The Board argues that there is no dispute regarding Urton's poor job performance. The Board explains that its decision to discipline Urton was based on undisputed information provided to it from third parties, such as HCESC. The Board also explains that the decision to terminate Urton was based upon her increasing her maximum accumulated vacation leave balance. The Board argues that there is no dispute that Urton lacked the authorization to do so. Urton responds that these reasons are pretext for retaliation.

To show pretext, a plaintiff must produce evidence that either the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). Urton relies on all three *Manzer* approaches to show that there is "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him" or her. *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008), *quoting Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original).

As discussed above, Urton argues that Lau stated in his deposition that he was advised to begin building a disciplinary record to justify getting Urton "out of the office." The Court notes that Hubbard made a similar statement in her deposition. While the Court finds that this evidence is insufficient direct evidence of retaliatory animus, the Court finds that these statements are sufficient evidence to create a genuine issue of material fact as to whether the Board's proffered reason for disciplining and terminating Urton was pretext to hide retaliation.

Next, Urton disputes the basis for her one-day suspension in September. Urton argues that the affidavit of Jon Strief, relied upon by the Board, is based upon hearsay.

Urton also disputes Strief's statements regarding her poor performance.  Urton points to the testimony of Thomas Schaefer, HCESC's Assistant Treasurer, who worked directly with Urton.  Schaefer testified that he found Urton to be cooperative when dealing with missing data issues, and he never had any issues with Urton which could not be resolved. (Schaefer Depo. at 11, 15, 17, 18, 22-23)  The Court finds that Schaefer's testimony creates a genuine issue of material fact as to whether Urton failed to perform her job responsibilities vis-a-vis HCESC.

Urton also disputes the basis for her five-day suspension in October.  Urton relies on her testimony and the testimony of Loos that Rhonda Propes and Loos were responsible for paying outstanding bills.  (Urton Depo. at 213-214; Loos Depo. at 10, 33, 44)  Urton also points to the testimony of Loos that it was Lau who caused the bill payments to be late. (Loos Depo. at 22, 23, 33, 42-43)  Urton could not explain why the SERS forms were missing, but points out that once she was notified of the missing forms, she pulled the forms from the personnel files and submitted them.  (Urton Depo. at 209-210)  Finally, Urton denies calling Lau a moron.  (Urton Depo. at 217)

With regards to the basis for her demotion, Urton admits that it was her responsibility to prepare and file taxes.  (Urton Depo. at 238) However, Urton explains that any notice of delinquency would have gone to Lau first, and if Lau had reconciled the appropriate accounts at the end of the month, he would have discovered any delinquency in the filing of the taxes.  (Id. at 238-39)  The Court finds that there are genuine issues of material fact as to who had certain job responsibilities and whether Urton had failed to perform her job responsibilities.

With regards to Urton's increase in her vacation leave, Urton relies on the testimony

of Al Porter, the system administrator for HCCA which provides payroll software to the Lockland School District. (Doc. 40, Al Porter Depo. at 8-10) Porter testified that Urton did have authorization to modify the maximum allowable accumulated vacation day balance because she had "full privileges." (Porter Depo. at 39-41 & Ex. 2 ) Urton also points out that she never sold or used the additional vacation days. (Urton Aff. ¶ 3) Urton explains that she only increased the number of vacation days, with Hubbard's approval, in order to maintain a record that those days had accumulated so that she could later resolve whether she would be allowed to use or sell some of the vacation days. (Urton Aff. ¶ 4) The Court finds that while Urton may have been authorized to make changes in the HCCA system, there is a genuine issue of material fact as to whether she was specifically authorized to increase her own maximum allowable accumulated vacation day balance. While Urton claims Hubbard approved the change, Hubbard denies that she or Lau authorized her to make the change. The Court finds that there is a genuine issue of material fact as to whether Urton was permitted to increase her maximum allowable accumulated vacation day balance.

The Board relied upon the Sixth Circuit's "modified honest-belief doctrine" in support of its motion for summary judgment, but not specifically in the context of Urton's retaliation claim. The Court will nevertheless address those arguments here.

The Sixth Circuit has adopted a modified honest-belief rule. *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 713-14 (6th Cir. 2007), *citing Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (explaining that "[t]o the extent the Seventh Circuit's application of the 'honest belief' rule credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology, we

reject its approach"). Under the Sixth Circuit's approach, for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.*, *quoting Smith v. Chrysler Corp.*, 155 F.3d 799, 806-807 (6th Cir.1998). Even when the employer makes such a showing, "the protection afforded by the rule is not automatic. . . . [O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce 'proof to the contrary.'"

*Id.* As the Sixth Circuit has explained:

> The honest-belief rule is, in effect, one last opportunity for the defendant to prevail on summary judgment. The defendant may rebut the plaintiff's evidence of pretext, by demonstrating that the defendant's actions, while perhaps "mistaken, foolish, trivial, or baseless," were not taken with discriminatory intent. We give the defendant an opportunity to show that its intent was pure, because "the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent."

*Id.* at 714 -715, *quoting Smith*, 155 F.3d at 806. The Court finds that while the Board has pointed to specific facts that it had at the time the decision was made which would justify its belief in the proffered reason, there is a genuine issue of material fact as to whether reliance on those facts was reasonable. The Court notes that there is testimony from Hubbard and Lau in the record that they were directed by the Board to collect a record of Urton's performance deficiencies. The Court finds that a reasonable jury could find that the Board did so in order to retaliate against Urton, and not for legitimate employment reasons.

Based on the foregoing, the Court finds that Urton has produced sufficient evidence to show that the Board's reasons for disciplining and terminating her were pretext.

Therefore, the Court concludes that the Board is not entitled to summary judgment on Urton's claim of retaliation under Title VII and Ohio law.

### D. Harassment

Harassment is actionable under Title VII where "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). To establish such a hostile work environment claim, a plaintiff must demonstrate that: (1) she was a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer did not take reasonable care to prevent and correct any sexually harassing behavior. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999).

To establish that the harassment was "based on her sex," a plaintiff "must show that but for the fact of her sex, she would not have been the object of harassment." *Id.* at 565, *citing Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). "[H]arassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." *Id.* However, harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Farra v. General Motors Corp.*, 163 F.Supp.2d 894, 906 (S.D.Ohio 2001), *quoting Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).

Urton has presented little to show that the harassment she suffered was based on her sex. While there is uncontested evidence that Lau was often angry and was rude to Urton, Title VII was not meant to be, and courts must ensure that it does not become a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), *citing Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 80 (1998). Urton could only remember one statement made by Lau which made her think that Lau believed men are superior to women. While Urton points to the occasion when Lau was dismissive of her in front of two male accountants, Lau made no reference to Urton's gender or the gender of the other women working in the Treasurer's office. Therefore, the Court finds that Urton has not shown evidence of harassment based on her sex, and accordingly, the Board is entitled to summary judgment on Plaintiff's claim of hostile work environment under Title VII and Ohio law.

### III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 36) is **GRANTED in PART** and **DENIED in PART**.

**IT IS SO ORDERED.**

                                       */s/ Michael R. Barrett*
                                       Michael R. Barrett, Judge
                                       United States District Court